IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CLETUS MCLAUGHLIN            :        CIVIL ACTION
                            :
          v.                :
                            :
SANOFI-AVENTIS U.S., INC.    :        NO. 09-4397

MEMORANDUM

Dalzell, J.                                    March 1, 2011

Plaintiff Cletus McLaughlin sues his employer, defendant Sanofi-Aventis U.S., Inc. ("Sanofi"), under the Americans with Disabilities Act ("ADA" of the "Act") for discrimination (Count I) and retaliation (Count II).

Sanofi moved for summary judgment, McLaughlin responded, and Sanofi replied. Sanofi contends that McLaughlin cannot establish a prima facie case for his claims, and that it had legitimate, nondiscriminatory reasons for terminating him. Sanofi also argues that McLaughlin cannot meet his burden with respect to establishing pretext.

For the reasons we discuss in detail below, we will grant Sanofi's motion for summary judgment and enter judgment in favor of it.

I.   **Factual Background**

Cletus McLaughlin worked for Sterling Winthrop as a security officer from 1993 until one of Sanofi's predecessor corporations acquired Sterling Winthrop in 1994. Defendant

Sanofi-Aventis U.S. Inc.'s Memorandum of Law in Support of its
Motion for Summary Judgment ("Def. MSJ"), Excerpts from the
Deposition of Cletus McLaughlin ("McLaughlin Dep.") 27:17 – 28:1.
After the acquisition, McLaughlin received temporary work on a
"transition team" and then began working as a security officer
for Sanofi's predecessor in 1995.  Id. at 28:11 – 29:5.
McLaughlin reported to Richard Ranke, who completed plaintiff's
performance appraisals.  Id. at 29:10-12; Ex. 2.  In 1998, Ranke
rated McLaughlin's performance as achieving expectations, but
noted that "Clete easily meets stated objectives each year, but
Security management feel[s] that there is a great deal of
'unlocked' potential that remains to be tapped."  Def. MSJ, Ex.
2.

        In 2003, McLaughlin was diagnosed with Langerhan's Cell
Histiocytosis, a rare condition which produced a brain tumor in
him.  McLaughlin Dep. at 10:15-20.  This required him to take
disability leave from work in order to undergo surgery and
receive radiation therapy.  Id. at 16:18-22.  McLaughlin began
his first disability leave on or around November 26, 2003, and
remained on this leave for five or six months.  Id. at 18:8-12.
During McLaughlin's disability leave, Brian Bean, McLaughlin's
supervisor at that time, completed plaintiff's performance
appraisal for 2003 and rated his performance -- given his

"significant personal crisis" -- as exceeding expectations.  Id.,
Ex. 5.  When plaintiff returned from his disability leave, he
experienced a "relatively smooth" transition, and he admits that
he did not suffer any discrimination at that time.  McLaughlin
Dep. at 30:13-21.

In 2005, McLaughlin needed chemotherapy to treat his
condition and took another disability leave in order to
facilitate this treatment.  McLaughlin Dep. at 18:2-7.  This
leave also lasted five or six months.  Id. at 18:8-12.  When
McLaughlin returned to work, he was allowed to "ease back into"
full-time work.  Id. at 105:10-106:1.  Although plaintiff claims
that it was after he returned from his second disability leave
that Sanofi's predecessor firm began to discriminate against him,
he received a positive performance review at that time that
McLaughlin felt was fair.  Id. at 43:18-44:1; Def. MSJ, Ex. 6.

Prior to 2006, one of McLaughlin's primary
responsibilities had been performing background checks on newly-
hired individuals.  Def. MSJ, Ex. 7.  In 2006, however, the
number of background checks required doubled due to the merger of
Sanofi's predecessor corporation with Aventis (creating Sanofi-
Aventis).  McLaughlin Dep. at 31:11-21.  This increased workload
led Sanofi to outsource the background checks to outside
companies.  Id.

Plaintiff's supervisor in 2006, John Rovinski, completed McLaughlin's performance review over a year after McLaughlin had returned from his second disability leave. Def. MSJ, Ex. 7. Rovinski rated McLaughlin's performance as meeting expectations. Id. But Rovinski also noted that the background checks for which MacLaughlin had previously been responsible had been outsourced, and that this would require him to "become more involved in other aspects/security programs and more complex initiatives." Id. Rovinski noted that plaintiff had "the knowledge and experience needed for a leadership role, but has to apply his talents in that direction." Id.

That same year, McLaughlin contacted human resources representative Nancy Baldwin to complain about the promotion of another security officer, Dave Outland, instead of him. Def. MSJ, Ex. 1. Baldwin contacted Ranke, who had by this time become McLaughlin's second-level manager. Id. Ranke explained in an email to Baldwin that McLaughlin had not been promoted because "[plaintiff's] performance is lackluster -- not saying that he doesn't do what is required, but that is all he does. . . ." Id.

In late 2006, Sanofi issued a corporate mandate that their security organization needed to have a full-time employee -- as opposed to a contractor -- on site around-the-clock. Dep.

of John Rovinski ("Rovinski Dep.") 36:1-8.  In November of 2006, Rovinski called a meeting of senior security officers Henry Callan, Foster "Reggie" Morgan, and McLaughlin to explain the new need for twenty-four-hour employee coverage at the facility.  Id. at 36:5-8.  Ranke was also present at the meeting and said that working the new schedule presented "an opportunity for advancement."  Def. MSJ, Ex. 8.  Officers Callan and Morgan agreed to work the new schedule, but McLaughlin resisted. Rovinski Dep. at 36:9-13.  McLaughlin later testified that he felt insulted by the new schedule because Outland had been promoted to a managerial position, while McLaughlin's life "was going to get turned upside down again working crazy hours." McLaughlin Dep. at 52:3-9.  Rovinski and Ranke let McLaughlin keep his old schedule while Officers Callan and Morgan began to work the new schedule and took on additional responsibilities. Def. MSJ, Ex. 8.

Plaintiff claims that he was singled out because he was the only non-contract employee asked to change his schedule.  Pl. Resp. at 6; McLaughlin Dep. at 50:9-14.  Plaintiff also claims that defendant required him to wear the same uniform as the contract employees -- instead of letting him wear what the other full-time employees were wearing -- because he was not in a "supervisory position."  McLaughlin Dep. at 48:3-12.

Several months later, McLaughlin sent Ranke an email explaining that his unwillingness to work the new schedule was a result of his responsibilities as a single parent. Def. MSJ, Ex. 9. He did not mention his illness as a reason that he could not work the new schedule. <u>Id.</u> In May of 2007, McLaughlin contacted Baldwin to complain that since his hesitation at working the new schedule Officers Callan and Morgan had been designated as "leads." <u>Id.</u>, Ex. 8.

In October of 2007, McLaughlin secretly altered the document containing the security shift schedule. <u>Id.</u>, Ex. 13. The schedule had previously reflected an even split of responsibility for working during Sanofi's shutdowns for the Thanksgiving and Christmas holidays, with McLaughlin working during the Thanksgiving shutdown and taking vacation over Christmas. <u>Id.</u> Someone subsequently altered the schedule to reflect plaintiff having his vacation over Thanksgiving <u>and</u> Christmas. <u>Id.</u> An investigation revealed that plaintiff made this change to the schedule without authorization and without informing his superiors or anyone else within the security organization. <u>Id.</u>

Rovinski completed McLaughlin's 2007 performance assessment in January of 2008. It reflected that McLaughlin had met objectives but had only done the bare minimum required of

him.  Id., Ex. 14 at 7 ("Clete prefers not to challenge existing
protocols, whether site or departmental in nature.  He does not
embrace and is slow to react to change. . . . He has not shown
the initiative nor innovation to substantially improve programs
or processes.").  McLaughlin continued to complain that he was
being unfairly passed over for promotion.  Id. ("Clete often
complains to others, both within and outside the department, that
he was by-passed for promotion during the last two years.").

        In April of 2008, McLaughlin learned that a certain
contract security officer had been barred from Sanofi's
facilities pending the resolution of an issue discovered during a
background check.  Id., Ex. 19.  McLaughlin's superiors
instructed him that the reason for this action was confidential
and he did not have permission to look into why the contract
security officer had been barred from the site.  Id.  Plaintiff's
superiors specifically directed him not to perform his own
investigation of the contract security officer.  Id.  McLaughlin
looked into it anyway, using Sanofi's resources to do so.  Id.
McLaughlin then informed his superiors that he knew what the
issue was, but gave contradictory answers about why he knew the
information.  His superiors investigated McLaughlin's computer
records, and discovered that he had, in fact, performed an
unauthorized background check.  Id., Ex. 20.  Upon discovering

this insubordination, on May 14, 2008 McLaughlin's superiors issued him a formal counseling letter, which was placed in his file. Id., Ex. 22. Plaintiff signed the counseling letter "under duress." Id., Ex. 21.[1]

In August of 2008, Sanofi changed McLaughlin's schedule to include eight-hour overnight shifts. Id., Ex. 23. Plaintiff complained about this change, but claimed it was his childcare responsibilities and not his medical condition that were the problem. Id. McLaughlin's physician contacted Sanofi's on-site physician, Dr. Margaret Stroz, to request that plaintiff not be made to work extended night shifts of twelve-hour duration because of McLaughlin's medical condition, and on September 4, 2008, Dr. Stroz relayed that message to Rovinski. Id., Ex. 24. As a result, Sanofi never required plaintiff to work the types of shifts that his doctor had suggested might exacerbate his condition. McLaughlin Dep. at 144:19-145:11. Despite this, McLaughlin filed his initial EEOC charge on September 23, 2008.[2]

---

[1] Plaintiff maintains in his response to defendant's motion that he was doing something that he was authorized to do. Pl. Resp. at 7 (citing McLaughlin Dep. at 33:8-34:5, 38:2-6).

[2] Plaintiff asserts in his response to the motion, without documentary evidence, that he filed two EEOC complaints, one on September 23, 2008, and another on December 18, 2008. McLaughlin claims in his amended complaint that he filed his second EEOC complaint on December 22, 2008. Defendant does not challenge these dates.

In October of 2008, Sanofi gave McLaughlin additional responsibilities. Rovinski Dep. at 45:5-17. Sanofi assigned him to the Key Program, which required him to update all procedures for the handling and distribution of keys to the many restricted-access areas of Sanofi's facilities. <u>Id.</u>; Dep. of Eugene Lucas ("Lucas Dep.") at 47:3-9. Plaintiff continually failed to update the Key Program.[3] Def. MSJ, Ex. 25-26. After having a month to update the Key Program, McLaughlin presented Lucas with a copy of the program exactly as it had existed in May of 2008.[4] <u>Id.</u>, Ex. 26. Lucas told plaintiff that this was unsatisfactory, and on November 13, 2008 gave him another opportunity to update the Program. <u>Id.</u> McLaughlin again presented Lucas with the previous iteration of the Program with only minor changes. <u>Id.</u> Lucas told plaintiff to take another hour and try again. When the hour had passed, McLaughlin presented the same Program with the same minor revisions. <u>Id.</u> When told for the third time that the revisions were unsatisfactory, McLaughlin said, "I'm not going to take this bullshit." <u>Id.</u>; Lucas Dep. at 67:19-24; McLaughlin Dep. at 97:10-98:11. In response to his outburst, on November 25,

------

[3] McLaughlin claims that defendant assigned this Program to him in an effort to "find fault with the way in which Plaintiff performed his key program functions." Pl. Resp. at 11-12.

[4] When Rovinski retired, Eugene Lucas replaced him as McLaughlin's supervisor. Rovinski Dep. at 21:3-22:7.

2008 Sanofi placed McLaughlin on a final written plan -- the last step in Sanofi's disciplinary procedure before termination.  Def. MSJ., Ex. 26.  The final written plan put McLaughlin on notice that if his performance did not improve, he would be terminated. <u>Id.</u>

Plaintiff claims that, as a result of Lucas's harassment, he

filed his second EEOC complaint on December 18, 2008. Pl. Resp. at 22.[5]

Defendant claims that McLaughlin's performance did not improve in the months following the issuance of his final written plan. Def. MSJ, Ex. 28; Ex. 29.

On January 23, 2009, Lucas met with McLaughlin and informed him that his performance was still below expectations and that it must improve immediately. Id., Ex. 29. McLaughlin did not improve his performance, and about a month later, on February 26, 2009, Sanofi fired him. Id., Ex. 31; Lucas Dep. at 61:20-23.

After his termination, McLaughlin submitted an application to the Social Security Administration ("SSA") for total disability benefits. Def. MSJ, Ex. 32; McLaughlin Dep. at 121:5-11. McLaughlin claimed to the SSA that he had become totally unable to work on February 26, 2009 as a result of his disabilities -- the very day Sanofi fired him. Def. MSJ, Ex. 32 at SSA0047; McLaughlin Dep. at 165:3-11. Several doctors examined McLaughlin and all agreed that he had decreased cognitive abilities. Two of the doctors felt that he did not have the capacity to perform effectively in an employment situation. Def.

_____

[5]Plaintiff's amended complaint states that he filed his second EEOC complaint on December 22, 2008.

MSJ, Ex. 34, Ex. 10, Ex. 36.  As a result of McLaughlin's

statement to the SSA, the judgment of the doctors who examined

him, and the submissions of plaintiff's own doctors and

professionals, the SSA determined that McLaughlin was totally

unable to work due to the effects and complications of his

Langerhan's Cell Histiocytosis, and granted him total disability

benefits.  Id., Ex. 38.  McLaughlin has received about $1,914 per

month since the SSA made its determination in August of 2009.

Id.; McLaughlin Dep. at 186:17-22.

## II.  **Analysis**[6]

---

[6]Summary judgment is appropriate when the "pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
that the movant party is entitled to judgment as a matter of
law."  Fed. R. Civ. P. 56(c)(2).  Whenever a factual issue arises
which cannot be resolved without a credibility determination, the
Court must credit the non-moving party's evidence over that
presented by the moving party.  Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 255 (1986).
     The moving party bears the initial burden of proving that
there is no genuine issue of material fact in dispute.
Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S.
574, 585 (1986). Once the moving party carries this burden, the
nonmoving party must "come forward with 'specific facts showing
there is a genuine issue for trial.'" Id. at 587 (quoting Fed. R.
Civ. P. 56(e)).  The non-moving party must present something more
than mere allegations, general denials, vague statements, or
suspicions.  Trap Rock Indus., Inc. v. Local 825, 982 F.2d 884,
890 (3d Cir. 1992); Fireman's Ins. Co. of Newark v. DuFresne, 676
F.2d 965, 969 (3d Cir. 1982).  It is not enough to discredit the
moving party's evidence, the non-moving party is also required to
"present affirmative evidence in order to defeat a properly
supported motion for summary judgment." Liberty Lobby, 477 U.S.
at 257.  A proper motion for summary judgment will not be
defeated by merely colorable or evidence that is not

Sanofi moves for summary judgment against McLaughlin on both counts of the complaint. The employer claims that McLaughlin cannot demonstrate a genuine issue of material fact to support his claims that Sanofi discriminated against him because of his disability and retaliated against him because he had filed EEOC complaints.

## A. Discrimination under the ADA

McLaughlin's claim of discrimination arises under the ADA. To establish a prima facie case of disability discrimination under the ADA, McLaughlin must present admissible evidence that he (1) had a "disability," (2) was qualified to perform the essential functions of his job, and (3) suffered an adverse employment action because of his disability. Deane v. Pocono Med. Ctr., 142 F.3d 138, 142 (3d Cir. 1998).

Courts evaluate an employee's claim that he was the subject of discrimination under the McDonnell Douglas burden-shifting paradigm. Lawrence v. Nat'l Westminster Bank N.J., 98 F.3d 61, 68 & n.7 (3d Cir. 1996). If McLaughlin can establish a prima facie case of discrimination, the burden shifts to Sanofi

---

significantly probative. See Liberty Lobby, 477 U.S. at 249-50. "[T]he burden on the moving party may be discharged by 'showing'...that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).

to articulate a legitimate, non-discriminatory reason for the
adverse employment action.  Walton v. Mental Health Ass'n of
Southeastern Pa., 168 F.3d 661, 668 (3d Cir. 1999)(citing
McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)).
Finally, the plaintiff has an opportunity to prove by a
preponderance of the evidence that the employer's
nondiscriminatory reason is pretextual.  Id. at 804; Texas Dep't
Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). The
McDonnell Douglas framework "serves to bring the litigants and
the court expeditiously and fairly to [the] ultimate question" of
whether the employer intentionally discriminated against the
employee.  Burdine, 450 U.S. at 253. In other words, that
framework helps courts determine whether unlawful discriminatory
reasons motivated an employer to take an adverse action against
an employee.

        Sanofi concedes that McLaughlin was disabled under the
Act, but argues that he cannot establish a prima facie case
because he was not a "qualified individual" under the Act.  Def.
MSJ at 18. Defendant argues that because plaintiff applied to the
SSA for total disability benefits, and the SSA found him to be
totally disabled, he is not a qualified individual. Id.

        To show that he was a "qualified individual" under the
Act, McLaughlin must proffer admissible evidence that he had the

14

requisite skill, experience, education and other job-related requirements of the position, and that he was able to perform the essential functions of his position as a senior security officer, with or without reasonable accommodation. Buskirk v. Apollo Metals, 307 F.3d 160, 168 (3d Cir. 2002). The Supreme Court has held that where a plaintiff in an ADA case has applied for and received Social Security disability benefits for total disability, the plaintiff cannot establish a prima facie case unless that plaintiff can "proffer a sufficient explanation" for "the apparent contradiction that arises out of the earlier [Social Security Disability Insurance ("SSDI")] total disability claim." Cleveland v. Policy Mgmt. Systems Corp., 526 U.S. 795, 806 (1999).

To avoid summary judgment, the plaintiff bears the burden of demonstrating the consistency of his assertions and cannot simply contradict his previous indication that he is unable to work. Id. The "explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless perform the essential functions of her job, with or without reasonable accommodation." Id. at 807 (internal quotation marks omitted).

Guided by <u>Cleveland</u>, we must determine whether the positions McLaughlin took in his Social Security disability application and his ADA claim genuinely conflict. <u>Detz v. Greiner Indus. Inc.</u>, 346 F.3d 109, 119 (3d Cir. 2003). On the one hand, as our Court of Appeals noted in <u>Detz</u>, in order to be "disabled" for SSDI purposes, an applicant must be incapable of performing his "previous work," and he must be found unable to perform "any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); <u>see</u> 20 C.F.R. §§ 404.1520(e)-(f), 404.1560(b)-(c) (2002). On the other hand, to establish a <u>prima facie</u> case under the ADA, plaintiff must show, among other things, that he was able to perform the essential functions of his position as a senior security officer, with or without reasonable accommodation. <u>Buskirk</u>, 307 F.3d at 168.

Because the SSA does not take reasonable accommodations into account, there are "many situations in which an SSDI claim and an ADA claim can comfortably exist side by side." <u>Cleveland</u>, 526 U.S. at 803. Because of the specialized nature of the inquiry under each statute, "an individual might qualify for SSDI under the SSA's rules and yet, due to special individual circumstances, remain capable of 'perform[ing] the essential functions' of her job." <u>Id.</u> at 804. Thus, "[t]he result is that an ADA suit

16

claiming that the plaintiff can perform her job <u>with</u> reasonable

accommodation may well prove consistent with an SSDI claim that

the plaintiff could not perform her own job (or other jobs)

<u>without</u> it." <u>Id.</u> at 803.

But this is not the claim that McLaughlin makes.  Here,

McLaughlin asserts that his statements to the SSA and to the

Court in his ADA claim are not inconsistent because he did not

become totally disabled until exactly the same day that Sanofi

terminated his employment.  McLaughlin contends that,

> up until the time he was terminated[,] he was
> physically and mentally capable of performing
> all functions of his job. . . [but that his]
> physician recommended that Plaintiff not be
> placed on an extended night shift or work for
> twelve hour durations    [, and that] the
> continual changes in his schedules could have
> an adverse impact on his medical condition.

Pl. Resp. at 16-17.  Plaintiff claims the defendant "indicated"

that he would not be accommodated, but he does not reconcile the

conflict by claiming he could have performed his job had Sanofi

made a reasonable accommodation.  Indeed, he merely argues -- not

without circularity -- that "he applied for disability solely

because he was terminated from Sanofi-Aventis because of his

disability and the fact that they told him he couldn't perform

the job anymore." <u>Id.</u> at 17 (citing McLaughlin Dep. at 17:13-

22).

McLaughlin's explanation that he applied for disability because Sanofi terminated him is not relevant to whether his statements to the SSA and to this Court conflict. McLaughlin explicitly argues that he was capable of performing his job without the need of reasonable accommodations and only applied for disability benefits because he was fired.[7] Pl. Resp. at 17. While this argument suggests that plaintiff may have misrepresented his disability to the SSA, it does not provide a reasonable explanation for the inconsistency. Thus, even viewing the facts in the light most favorable to him, McLaughlin has failed to establish that he was a "qualified individual" and thus we will grant defendant's motion for summary judgment with regard to McLaughlin's claim of disability discrimination.

Even if McLaughlin had established a prima facie case of disability discrimination, Sanofi has proffered plaintiff's poor performance and failure to improve that performance as a legitimate, non-discriminatory reason for its behavior with regard to McLaughlin.

Once a defendant employer answers a plaintiff's prima facie case with a legitimate, non-discriminatory reason for its actions, the plaintiff must point to some evidence from which the

_____

[7]McLaughlin makes this argument even though defendant acknowledges in its motion that it provided him with reasonable accommodations when he requested them. Def. MSJ at 11-12.

fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons, or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's actions. <u>Fuentes v. Perskie</u>, 32 F.3d 759, 764 (3d Cir. 1994).

McLaughlin contends that his employer (1) did not have problems with his performance until after he returned from his second disability leave, (2) assigned some of his responsibilities to someone else while he was on leave and then did not give them back, (3) outsourced some of his responsibilities, (4) assigned him work that was beneath him, (5) constantly changed its expectations regarding his performance, (6) promoted less qualified coworkers ahead of him, and (7) constantly changed his schedule without notice. Pl. Resp. at 18-19. We will review those contentions in turn.

The record shows first that the workload doubled after the 2006 merger and this accounted for the new firm (a) giving McLaughlin different responsibilities when he returned from his disability leave, (b) outsourcing some of his responsibilities, and (c) changing his schedule. McLaughlin Dep. at 31:11-21. Second, we have found no evidence that Sanofi "constantly" changed its expectations of his performance; indeed, McLaughlin proffers no such evidence. Third, the evidence presented

19

regarding his performance and attitude accounts for others being promoted ahead of him. Def. MSJ, Ex. 1, 7, 14, 22. Fourth, his supervisors testified that assigning him to the Key Program -- work that he considered to be beneath him -- was a responsibility that was appropriate to someone with his experience and qualifications. Rovinski Dep. at 45:21; Lucas Dep. at 42:24- 43:6. Finally, the fact that Sanofi did not have problems with his performance until after he returned from disability leave does not create a showing of pretext sufficient to defeat summary judgment. See Hunter v. Rowan Univ., 299 Fed. App'x 190, 195 (3d Cir. 2008) (affirming grant of summary judgment to employer and holding that "[t]he mere existence of positive evaluations by a supervisor does not give rise to the inference that negative evaluations from another supervisor were a pretext.").

Thus, even if McLaughlin had made a prima facie disability discrimination claim, his employer has proffered a legitimate non-discriminatory reason for dismissing him, and he has not proffered evidence from which a reasonable factfinder could find pretext for his firing.

## B. Retaliation under the ADA[8]

---

[8]To the extent that McLaughlin argues in his responsive brief that he suffered any actionable retaliation other than his termination, he is foreclosed from raising these claims because he failed to plead them in his amended complaint. See Bell v. City of Phila., 275 Fed. App'x 157, 160 (3d Cir. 2008) (holding

McLaughlin's second claim is that Sanofi retaliated against him by terminating him after he filed his EEOC complaints. A plaintiff bears the burden of establishing a <u>prima facie</u> case of retaliation by demonstrating that (1) he participated in a protected employee activity, (2) the employer acted adversely either after or contemporaneous with the employee's protected activity, and (3) there is a causal connection between the employee's protected activity and the employer's adverse action. <u>Williams v. Phila. Housing Auth. Police Dep't</u>, 380 F.3d 751, 759 (3d Cir. 2004). The <u>McDonnell Douglas</u> burden-shifting framework also applies to ADA retaliation claims. <u>Id.</u> at 760 n.3.

Sanofi assumes for the purposes of its motion that McLaughlin has proved the first two elements, but argues that his claim fails because he cannot establish a causal connection between his EEOC charge and his termination. Def. MSJ at 25.

Our Court of Appeals has held that in the ADA retaliation context, "temporal proximity between the protected activity and the termination can be itself sufficient to establish a causal link. . . [but] the timing of the alleged retaliatory action must be unusually suggestive of retaliatory

_____

that a plaintiff "may not amend his complaint through arguments
in his brief in opposition to a motion for summary judgment").

21

motive before a causal link will be inferred." <u>Williams</u>, 380 F.3d at 760 (internal quotation marks and brackets omitted). In <u>Williams</u>, over two months had elapsed between the time that plaintiff requested an assignment and the time that he was terminated.  Our Court of Appeals found that this duration was too long to be unusually suggestive of retaliatory motive.  <u>Id.</u> Where the temporal proximity is not so close as to be unduly suggestive, our Court of Appeals recognized that "timing plus other evidence may be an appropriate test." <u>Id.</u> (internal quotation marks omitted, citing <u>Thomas v. Town of Hammonton</u>, 351 F.3d 108, 114 (3d Cir. 2003)).

Here, McLaughlin filed his first EEOC complaint on September 23, 2008.  He told his supervisor, "I'm not going to take this bullshit" on November 13, 2008, and twelve days later he was placed on a final written plan.  Plaintiff filed his second EEOC complaint on December 18, 2008.  Sanofi did not terminate him until February 26, 2009 -- over two months after he filed his second EEOC complaint, and almost five months after he filed his initial EEOC complaint.  The EEOC complaints and the alleged retaliation are thus too remote to be unduly suggestive.

We must look to whether McLaughlin cites any other evidence that his employer terminated him because he filed the EEOC complaints.  To be sure, McLaughlin cites other instances of

alleged retaliation,[9] but offers no additional evidence that Sanofi <u>terminated</u> him because he filed EEOC complaints. On this record, even viewed in the most favorable light to McLaughlin, Sanofi is entitled to summary judgment on McLaughlin's retaliation claim as a matter of law.

But even if McLaughlin had established a <u>prima facie</u> case of retaliation, Sanofi has articulated several legitimate reasons for terminating him. McLaughlin argues in his response to defendant's motion that "the analysis of pretext relating to Plaintiff's retaliation claim is identical to that set forth <u>supra.</u>, [sic] as it relates to his claims for disability discrimination." Pl. Resp. at 22. Because we have already found that McLaughlin's proffered evidence of pretext will not support his discrimination claim, and he makes the same argument with regard to his retaliation claim, that argument fails as to retaliation as well.

## III. <u>Conclusion</u>

---

[9] McLaughlin argues that his employer constantly changed his schedule very soon after he filed his first EEOC complaint. He also claims that his supervisor bullied him and that this bullying led him to file his second EEOC complaint. Plaintiff contends that his supervisor continued to bully him after he filed his EEOC complaint. Pl. Resp. at 22. But neither of these facts supports plaintiff's claim that defendant <u>terminated</u> him because of his EEOC complaints. And because Lucas's alleged behavior, according to McLaughlin, did <u>not</u> change after he filed his second EEOC complaint, this fact does not weigh in plaintiff's favor on the pretext issue.

Because McLaughlin has neither established a <u>prima
facie</u> case for his discrimination claim or his retaliation claim
nor has he demonstrated that Sanofi's legitimate,
nondiscriminatory reasons for terminating his employment were
pretextual, we will grant Sanofi's motion for summary judgment
and enter Judgment in its favor.

BY THE COURT:


__\s\Stewart Dalzell